FILED

2006 Mar-28  AM 10:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| KAY STONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 3:01-CV-01862-VEH |
| THE HEALTH CARE AUTHORITY | ) | |
| OF THE CITY OF HUNTSVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

_____This matter is before the Court on Defendant Health Care Authority of the City

of Huntsville's (hereinafter "Huntsville Hospital") October 17, 2002, motion for

summary judgement as to Plaintiff Kay Stone's (hereinafter "Stone") claims.  Stone

commenced this action on July 27, 2001, by filing a complaint in this Court alleging

separate and individual violations of the Americans with Disabilities Act of 1990

(ADA), 42 U.S.C. §§ 12101-12213, as amended, and Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 294. [Complaint ¶ 1].  Stone alleges that she

is a qualified individual with a disability who suffers from Attention Deficit-

Hyperactivity Disorder (hereinafter "ADHD"), depression, post-traumatic stress

syndrome, and borderline I.Q. [Complaint ¶¶ 8, 10].  Stone contends that Huntsville

Hospital refused to accommodate her disabilities and on or about March 31, 2000

Huntsville Hospital discharged Stone because of her disabilities and/or her requests for accommodation. [Complaint ¶¶ 11-13].

Defendant's motion was initially before the Honorable Judge Lynwood Smith. Judge Smith granted summary judgment in favor of the Defendant and adopted the Defendant's briefs as the opinion of the Court.  This decision was appealed and the Eleventh Circuit Court of Appeals vacated and remanded Judge Smith's decision.[1] This matter is now properly before this Court.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a

---

[1] The opinion was vacated and remanded on the grounds of Judge Smith's decision to adopt the Defendant's briefs as the opinion of the Court.  However, the 11th Circuit Court also noted that genuine issues of material fact may exist which would also preclude the case from summary judgement.

genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant.  *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary

judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method,

4

the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).

## FACTS[2]

Stone suffers from type I diabetes and at various times during her life has been diagnosed with attention deficit hyperactivity disorder (ADHD), depression, various personality disorders, post-traumatic stress syndrome (PTSD), bulimia, laxative abuse, trichotillomania (pulling out your own hair), and borderline I.Q. [Complaint ¶ 8; Dr. Sandy Depo. at 42-44, 49-51, 57-58, 63, 108; Dr. Johnson Depo. at 19-22]. As a result of these disabilities, Stone is impaired in the following areas: (1) her ability to communicate; (2) her ability to function socially; (3) her ability to learn new tasks and; (3) her ability to work.  [Dr. Sandy Depo. at 95, 145, 187, 210, 232-34, 249-250, 300-301].

---

[2] Where facts are disputed, the Court, as it must, has viewed the facts in the light most favorable to Stone, the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

Stone was a full-time employee of Huntsville Hospital from 1990 until her termination on March 31, 2000. [K. Stone Depo. at 9-10]. During the early years of her employment Stone's primary job was filing but she was also used to fill in for three mail couriers in the event of a courier's absence. [McGaha Aff. ¶ 3]. There were three mail couriers; two delivered mail on the outside routes of the hospital and the other delivered mail on the inside route. If any of those couriers were absent, Stone was assigned to cover the inside route and the other two couriers were assigned to the outside routes. [K. Stone Depo. at 73-77]. Stone was unable to perform the outside routes because she was prohibited from driving after an automobile accident in 1994; this accident created problems with Stone's ability to obtain coverage under the Hospital's liability insurance policy. [Rosler Depo. at 67-68]. As an accommodation for Stone's diabetes and inability to drive, other hospital employees would drive her to the post office whenever it was her responsibility to pick up the mail. [Pl. Depo. at 199-202].

By the late 1990's, Huntsville Hospital stopped maintaining hard-copy records of patient admissions and emergency room treatments. [Newby Depo. at 35-36]. These categories were two of the three categories which Stone was responsible for filing. [Henderson Depo. at 181-86]. The elimination of these two categories caused Stone's filing duties to be decreased. [Newby Depo. at 35-36; Henderson Depo. at

181-86].

As a result of this decrease in duties, Stone was reclassified as a "courier/file clerk" and she was used to perform tasks in other areas of the office on a more frequent basis. [Pl. Depo. at 93-94, 125-128; Newby Depo. at 45; Henderson Depo. at 181-86]. However, Stone maintains that her filing work was her essential function and her work as a relief courier was a "secondary" function. [Pl. Ex. 47 at HH0045-HH0047 (1999)]. Huntsville Hospital contends that by the end of 2001, Stone's old job as a file clerk had been totally eliminated. [Henderson Aff. ¶ 15]. There is currently no file clerk or file room in the Patient Accounting Office where Stone previously worked. [Newby Depo. at 44-45].

In late 1999, one of the mail employees who was regularly assigned to cover the inside mail route had to be off work for several months. [Rosler Depo. II at 163-167]. Consequently, Stone was assigned to mail courier duties with increasing frequency. [Rosler Depo. II at 163-167]. During this time period, Stone's anxieties increased, her work performance decreased, and tensions escalated between Stone and her supervisor, JoAnn McGaha (hereinafter "McGaha"). [X21 to K. Stone Depo.]. Stone contends that her problems completing the mail rounds were not new but rather made issue only toward the end of her employment. [K. Stone Aff. at ¶ 26]. Stone's work related problems resulted in constant oral and written reprimand. [K.

Stone Aff. at ¶ 26].  The primary issue surrounding Stone's completion of the mail rounds involved timing.  It was important that the mail be delivered in a timely manner to the various departments within the hospital because sometimes the mail delivery affected other aspects of the Hospital's business. [Rosler Depo. II at 152]. For example, the Business Office's needed the mail by a certain hour in order  to make timely bank deposits which would then be eligible for daily interest. [Rosler Depo. II at 152-154].  Although Stone usually delivered the mail on time, she was often late enough that various departments complained that they were not getting their mail on time. [Freeman Depo. at 61, 65, 68-76; Rosler Depo. at 117-22 & EX 44 thereto].

Stone alleges that she was mistreated by McGaha during the latter periods of her employment. [K. Stone Aff. at ¶ 18-19].  Huntsville Hospital denies this assertion and both parties proffer deposition testimony to support their contentions.  Stone admits that she is more sensitive than the average person but she claims that the harsh treatment adversely affected her job performance.[3] [Pl. Br. at 11].

On the afternoon of March 30, 2000, McGaha called Stone into her office and

_____

[3] The Court has taken notice of the several pieces of correspondence between Stone and McGaha and other Huntsville Hospital personnel which have been incorporated into the Plaintiff's briefs. For the sake of brevity, such correspondence will be referred to as needed in the "analysis" portion of this opinion and will not be specifically addressed in the "facts" portion.

counseled her regarding her job performance. [PX 63]. During this counseling, Stone became upset and after work she said to her mother: "[m]om, JoAnn just got me so upset I felt like choking her neck" or similar words to the same effect. [R. Stone Depo. at 140-41; DX 61]. Stone's mother helped her prepare a letter to McGaha which discussed the manner in which McGaha had addressed Stone the previous day. [PX 62]. McGaha received the letter the next morning, then drove Stone to the Post Office to get the mail. [McGaha Depo. at 28, 33, 113]. That morning Stone did her inside mail rounds without incident. [McGaha Depo. at 21, 27]. During her lunch break, Stone told a co-worker, Amy Ashby (hereinafter "Ashby"), that she had been so angry with McGaha the previous afternoon that she felt like she was going to choke McGaha's neck; she then made a choking gesture with her hands. [Ashby Depo. at 25-26]. Based on the conversation with Stone, Ashby believed that JoAnn McGaha was in danger of imminent harm. [Ashby Depo. at 25-26]. Because of her concerns, Ashby approached McGaha and told her about the conversation she had with Stone during lunch. [Ashby Depo. at 24-31]. McGaha then reported this information to the Human Resources Department and her manager, Jan Henderson. [McGaha Depo. at 141-53]. Human Resources instructed McGaha

to have Ashby document her conversation with Stone.[4] [Rosler Depo. II at 292-93]. McGaha then reported to the office of Andrea Rosler, Vice President of Human Resources. [Rosler Depo. at 211-12]. Rosler explained that she wanted to meet with Ashby personally and hear exactly what Stone said; McGaha was given permission to go home early. [Rosler Aff. ¶ 54; Rosler Depo. at 295-96].

After meeting with Ashby, Jan Henderson and Andrea Rosler met with Stone and, during their meeting, Stone admitted to making the alleged statement. [Rosler Aff. ¶ 61; K. Stone Depo. at 248-49 & Ex. 59 thereto; Henderson Depo. at 134]. The meeting concluded when Andrea Rosler made the decision to terminate Stone's employment with Huntsville Hospital. [ Rosler Aff. ¶ 52, 66]. Shortly after her termination, Stone wrote a description of her termination meeting and in her own handwriting stated: "Andrea Rosler asked me if I said that I felt like choking Joan McGaha's neck and me being honest I said yes..." [K. Stone Depo. at 251-52 & Ex. 59 thereto].

Huntsville Hospital has a zero-tolerance policy regarding workplace threats; this policy states that you are not allowed to threaten another hospital employee

---

[4] The Court has taken notice of the conflicting evidence presented by the parties regarding the statement Ashby provided to the Human Resources Department. The Court cannot make findings of credibility at the summary judgement stage, however, the Court has determined that the conflicting statements given by Ashby are not needed to determine summary judgement in this case. Consequently, the opinion of this Court has not been founded on Ashby's statement to Human Resources.

regardless of your true intentions. [Rosler Depo. at 182-90, 216].

Two days before Stone's termination, another hospital employee was terminated for making a threat after a confrontation with another hospital employee. [Rosler Aff. ¶¶ 67-68; Rosler Depo. at 240-41].  This particular employee claimed that he was not "serious," however, Rosler terminated his employment. [Rosler Aff. ¶¶ 67-68; Rosler Depo. at 240-41].


## ANALYSIS

Stone presents three claims for this Court address, Stone contends: (1) she suffered a discriminatory discharge because of her disabilities; (2) she was retaliated against because of her requests for accommodation and; (3) Huntsville Hospital failed to accommodate her disabilities as required under the ADA.  [Complaint ¶¶ 12, 14]. Each of the aforementioned claims will be addressed individually.

### I. Discriminatory Discharge

The ADA provides that an employer may not discriminate against an individual with a disability because of that disability with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  In order to prevail on an ADA claim, a plaintiff must first establish that

11

"(1) she has a disability; (2) she is a qualified individual; and (3) she was unlawfully subjected to discrimination because of this disability." *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998).  Discrimination claims under the Rehabilitation Act of 1973 are governed by the same proof standards used in ADA cases. *Holbrook v. City of Alpharetta, Georgia*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).  Thus, "cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice versa." *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000).

For the purposes of this motion only, Huntsville Hospital does not dispute that Stone is disabled within the meaning of the ADA. [Def. Br. at 41].  Therefore, Stone only bears the burden of proving that (1) she is a qualified individual and; (2) she was unlawfully subjected to discrimination.

Huntsville Hospital contends that Stone is not a qualified individual within the meaning of the ADA because she presented a direct threat to the Hospital staff, specifically McGaha. [Pl. Br. at 42].  The ADA permits an employer to discharge a disabled employee if the employee is a "direct threat" to the health and safety of other individuals in the workplace. *See* 42 U.S.C. § 12113(a), (b); *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996).  The ADA defines direct threat as "a significant risk to the health or safety of others that cannot be eliminated by a

12

reasonable accommodation." 42 U.S.C. § 12111(3).  The Eleventh Circuit has held that the plaintiff in an ADA case has the burden of proving that she was not a "direct threat."  *See LaChance*, 146 F.3d at 836.  Accordingly, Stone has the burden of proving that she was not a direct threat to herself, or McGaha.

Huntsville Hospital contends that Stone's statement that she wanted to choke McGaha constituted a direct threat and therefore justified her termination in light of her disability.  Stone contends that her threats were not serious and were merely a figure of speech and that it was Huntsville Hospital's failure to accommodate her disability which caused her outburst. Stone also alleges that Huntsville Hospital did not perform a reasonable investigation into her actions before making the decision to terminate her employment.

In the instant case, it is Stone's own handwritten account of the events  as they occurred on the date of her termination which casts the most doubt on her contentions regarding her "seriousness."  Stone stated in her own handwritten testimony, on two separate occasions that: (1) "I said to my Mom that I was going to choke her neck" and; (2) "I talked to Amy as I usually do and I said that I had felt like chocking [sic] JoAnn's neck...Andrea Rosler asked me if I said that I felt like choking JoAnn McGaha's neck and me being honest I said yes...she made me mad" [DX 59 to K.Stone Depo.].  Stone's assertion that she was not "serious" does nothing to rebut

13

the fact that she may have been perceived as a direct threat on the day in question.

The implementing regulations require that:

> "[t]he determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." 29 C.F.R. § 1630.2(r).

The key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

In the instant case, it is clear that Huntsville Hospital relied on "the best available objective evidence" when it made the decision to terminate Stone. Stone made a threat, another co-worker reported the threat, HR spoke with Stone, and she was terminated. The ADA does not require an employer to retain a potentially violent employee because such a requirement would place the employer in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if the employee were retained and later harmed someone. *Palmer v. Circuit Court of Cook County Illinois*, 117 F.3d 351 (7th Cir. 1997). Additionally, Huntsville Hospital presented evidence that it had recently terminated an African-American employee earlier in the week for making similar threats in the workplace. Under the

same theory presented in *Palmer*, the retention of Stone after a blatant violation of Huntsville Hospital's policy may have subjected the Hospital to liability under Title VII from the employee who was terminated for his violation of the same policy.

Stone's own undisputed testimony affirms the fact that Huntsville Hospital could, in good faith, perceive Stone as a direct threat to McGaha. Stone's assertion that these words were merely a "figure of speech" are without merit and no precedent is cited to support Stone's contentions that the "seriousness" of a threat should be determined by the advocate of such statements. The Court has therefore determined that Stone could, in good faith, be perceived as a direct threat to McGaha. Because Stone posed a direct threat to McGaha, she is not considered a "qualified" individual under the ADA and therefore cannot establish a prima facie case of discrimination. Accordingly, Huntsville Hospital is entitled to summary judgment as to this claim.

## II. Retaliation

To establish a prima facie case of retaliation under the ADA, Stone must show (1) that she engaged in a protected expression or activity; (2) she suffered an adverse employment action; (3) the adverse action was causally related to the protected expression or activity. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021

(11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

To satisfy the first element, Stone contends that letter she gave McGaha on the morning of her termination was the "protected activity" which served as the basis for retaliation. [Pl. Br. at 76].  The letter informs McGaha that Stone was not pleased with the previous day's counseling session regarding her job performance. [PX 62]. At the end of the letter, Stone states "[p]lease consider my request for better treatment." [PX 62].  Because this request for "better treatment" could be considered as a request for accomodation, the Court has determined that Stone has satisfied the first element of the prima facie case. *See Standard v. A.B.E.L. Services Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998).  Additionally, because Stone suffered the adverse employment action of termination, the second element of her prima facie case has also been met. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). However, Stone still has the burden of proving that her termination was causally related to the submission of her letter.  To meet this burden, a plaintiff is only required to show that the protected activity and the adverse action were not "wholly unrelated." *Goldsmith*, 996 F.2d at 1163.  In order to show the two things were not entirely unrelated, a plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. *Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  To establish

16

causation, Stone relies primarily upon the short amount of time which elapsed between the delivery of her letter and her termination. [Pl. Br. at 76]. The Court has determined that this time period *alone*, while evidence of causation, is insufficient to prove causation, by itself.  The law in this Circuit requires the *decision maker's* awareness of the protected conduct at the time of the adverse employment action. *See Brungart*, 231 F.3d 799.  Stone has not presented evidence demonstrating that Andrea Rolser (the "decision maker" involved in Stone's termination) was aware of her letter on the date of her termination.  However even if Stone could somehow satisfy the third element of the prima facie case, her claim would still fail because she cannot establish that Huntsville Hospital's legitimate non-discriminatory reason for her termination was a pretext for discrimination.  Stone is disabled and she was terminated, but she has not shown that she was terminated because of a protected activity.  The uncontroverted evidence is that that Stone was terminated for threatening a co-worker.  Because Stone cannot establish a prima facie case of retaliation, Huntsville Hospital is entitled to summary judgement as to this claim.

### III. Failure to Accommodate

Under the ADA it is unlawful for a covered entity not to make a reasonable accomodation of an otherwise qualified applicant or employee unless the covered entity can demonstrate that the imposition of the reasonable accomodation would

impose an undue hardship on the operation of the business. 29 U.S.C. § 1630.9.  The plaintiff bears the burden of production of identifying an accomodation that would allow her to perform the job's essential functions, and the burden of persuasion with respect to demonstrating that such accomodation is reasonable. *See Lucas v. W.W. Grainger*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).  The duty to provide a reasonable accomodation is not triggered unless the employee makes a specific request for accomodation. *Gatson v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  A plaintiff is not entitled to her preferred accomodation, only one that is reasonable. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997).  The law requires an employer to engage in good faith in an "interactive process" of accommodating a plaintiff, after the employer is informed of the need for accommodation. *Stewart*, 117 F.3d at 1286-87.

The first dispute between the parties regards whether Stone's duties as a mail courier are considered "essential functions."  Stone contends that the functions are not essential and therefore could have been eliminated.  However, employers are only required to provide accommodation when such accommodation would allow a disabled person to perform essential functions of his or her job. *See Lucas*, 275 F.3d at 1255-56.  If the Court determines that the courier duties were essential functions, then Stone will not have a basis for a failure to accommodate claim. However, Stone

contends that because her courier functions were not essential, they could have been eliminated from her list of job responsibilities, which would have relieved her stress and prevented her comments which resulted in her termination. [Pl. Br. at 35-38]. The Court must therefore determine whether Stone's functions as a courier were indeed essential.

Huntsville Hospital has presented evidence supporting the fact that Stone was assigned to courier duties with increasing frequency because her filing duties were decreasing as the hospital began keeping electronic records. [Newby Depo. at 35-36]. Stone herself testified that she understood her duties as a courier were becoming essential functions.  For example, Stone states "it seems to be like mail was all of the sudden becoming more of one of my essential functions." [Stone Depo. at 127-29]. She was also told on January 10, 2000: "you are rated on mail room duties because they are an essential part of your job." [DX 55].  The courier duties also were not something new for Stone as she had often worked as a relief courier during her tenure at Huntsville Hospital. [McGaha Aff. ¶ 6; PX 37].  To support her contention that her courier duties were not an essential function, Stone cites work schedules which list her courier duties as a "secondary" function. However, Stone has not presented any authority which would support a finding that the term "secondary" is analogous to the term "non-essential." The Court has therefore determined that Stone's duties as a mail

courier were indeed an essential function and will proceed under this conclusion.

Stone next contends that Huntsville Hospital never engaged in an "interactive process" to determine appropriate accommodations for her disability. [Pl. Br. at 71]. Huntsville Hospital contends that the accommodations provided to Stone were reasonable in light of her disabilities and that it did engage in an interactive process with Stone to determine those accommodations. [Def. Br. at 34-35].  Therefore, the proper analysis for this claim is: (1) whether Huntsville Hospital engaged in the interactive process; (2) whether the current accommodations provided to Stone were reasonable; and (3) whether Huntsville Hospital was required to accommodate Stone so as to provide a stress free work environment.

Stone's contention that Huntsville Hospital did not engage in an interactive process of accomodation is unfounded.  The briefs submitted by the parties include correspondence from Stone discussing accommodations with her employer.  For example, Rosler's last written communication with Stone stated: "I want to meet with you as soon as possible to discuss whether there are accommodations within the policy that can be made to better meet any special needs you may have...we will consider any information you provide or information you request." This is evidence that Huntsville Hospital was indeed engaged in an interactive accommodation process with Stone.

In response to Stone's correspondence, Huntsville Hospital provided the following accommodations: (1) preparation of a written list of mail stops to carry while doing the rounds; this accommodation would alleviate the "confusion" Stone experienced with doing the mail rounds; (2) Patient Accounting keeping juice, snacks, and a glucose tester for Stone to monitor her diabetes while at work; and (3) other employees driving Stone to the Post Office when it was her responsibility to pick up the mail. [McGaha Aff. ¶ 6; Henderson Depo. at 51-54; McGaha Depo. II at 27-32].  The Court has determined that these accommodations are reasonable and undeniably allowed Stone to perform the essential functions of her job as evidenced by her continued employment.

The issue then becomes whether Huntsville Hospital should have accommodated Stone by alleviating the criticism and work related stress which allegedly led her to make the comments which resulted in her termination.  Huntsville Hospital is not under an obligation to provide a stress free work environment to employees under the ADA.  "An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position. Absence of such skills prevents the employee from be 'otherwise qualified.'" *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290-91 (11th Cir. 2002).  Stone does not dispute that her repeated reprimands and counseling from McGaha were a result of

her inability to successfully complete the mail rounds. [Pl. Br. at 9]. Additionally, Stone has admitted that she is more sensitive than the average person. [Pl. Br. at 11]. This increased sensitivity may have caused Stone's job to be more stressful, but Huntsville Hospital is under no obligation to accommodate "stressed employees," only those who are disabled. After reviewing the evidence presented by the parties, it appears that Stone is unable to complete the essential functions of her mail courier job even with the written schedule accommodation and the transportation accommodation. Her inability to do this renders her not "otherwise qualified." The Court has also determined that Huntsville Hospital was not under an obligation to provide the accomodation of a "stress free" work environment.

Huntsville Hospital has also presented additional evidence of Stone's Social Security disability benefits application which states, under oath, that she was "totally and permanently disabled" on March 31, 2000, the same date of her termination. The Supreme Court has held that:

> "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case--at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation. *Cleveland v. Policy Management Systems*, 526 U.S. 795, 806 (1999).

The only evidence in the record which may be somehow construed as an "explanation" of the testimony in this application is one or two references to Stone's deteriorating health after her termination. [Pl. Br. at 54]. However, this evidence is not directed specifically at rebutting the evidence in the SSDI application. Stone's application specifically states: "her difficulties got worse" prior to her termination and "they prevented her from carrying out her new duties as courier at Huntsville Hospital in a satisfactory manner." [DX 8].

After reviewing the evidence  presented by the parties, the Court has determined that Stone's inability to perform the essential functions of "courier/file clerk" keep her from being otherwise qualified, that is, able to perform the essential functions of her job with or without reasonable accomodation.  Additionally, Stone has not identified any *reasonable* accommodation which would allow her to perform the essential functions of the courier position.  Because Stone is not otherwise qualified, she is unable to satisfy the second element of her prima facie case and therefore her claim should fail.  Accordingly, Huntsville Hospital is entitled to summary judgment as to this claim.

## CONCLUSION

_____For the reasons set forth above, the Court grants Defendant Huntsville

Hospital's motion for summary judgement as to Plaintiff Stone's discrimination, retaliation, and failure to accommodate claims.

**DONE** and **ORDERED** this 28th day of March, 2006.

**VIRGINIA EMERSON HOPKINS**

United States District Judge